UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHARIFA AYUBY,<br><br>  Plaintiff,<br><br>  v.<br><br>CAROLYN COLVIN,<br><br>  Defendant. | Case No. 14-cv-02358-MEJ<br><br>**ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 12, 15 |

## INTRODUCTION

Plaintiff Sharifa Ayuby ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a final decision of Defendant Carolyn Colvin, the Acting Commissioner of Social Security, denying Plaintiff's claim for disability benefits. Pending before the Court are the parties' cross-motions for summary judgment. Dkt. Nos. 12, 15. Pursuant to Civil Local Rule 16-5, the motions have been submitted on the papers without oral argument. Having carefully reviewed the parties' positions, the Administrative Record ("AR"), and relevant legal authority, the Court hereby DENIES Plaintiff's motion and GRANTS the Commissioner's cross-motion for the reasons set forth below.

## BACKGROUND

Plaintiff was born on November 20, 1960 in Afghanistan and received a limited education in that country. Pl.'s Stmnt. of Facts ¶ 1, Dkt. No. 11. Her ability to communicate in English is limited, and she has no past relevant work. AR 22-23.

Beginning in September 2003, Plaintiff was treated "intermittently" by her hand surgeon, Brent Keyser, M.D., at the Hand Treatment Center. AR 359-65, 414, 416-69. Plaintiff underwent

left carpal tunnel release surgery in February 2004 and right carpal tunnel release in August 2004. AR 414. "She recovered fairly well from these procedures" until she began to complain of bilateral arm pain in October 2004. AR 414, 439-41. Plaintiff saw Dr. Keyser twice in 2005 and once in 2006, before visiting him again in August 2008. AR 414, 432-38.

On August 14, 2008, Plaintiff visited Dr. Keyser with "many of [the] same complaints as before." AR 432. Dr. Keyser reviewed an August 5, 2008 nerve conduction study of Plaintiff's hands, performed by Vicky Economou, M.D., which showed moderate bilateral carpal tunnel syndrome affecting sensory and motor components, without evidence of ongoing denervation; and without evidence of cervical radiculopathy or brachial plexopathy. AR 334. Dr. Keyser noted "probable fibromyalgia." AR 432. In September 2008, Dr. Keyser noted that Plaintiff was starting physical therapy and required follow up for "possible fibromyalgia." AR 362, 431. He noted that her symptoms were "not helped much" by Lyrica. AR 362, 431.

On November 30, 2008, Dr. Keyser submitted a medical source statement on Plaintiff's behalf. AR 336-38. He indicated that Plaintiff had symptoms of neck, shoulder and bilateral upper extremity pain, aggravated by even light activities of daily living. AR 336. He opined that Plaintiff was unable to lift and/or carry more than 10 pounds occasionally; could perform no more than occasional stooping, kneeling, crouching; and no more than occasional reaching, handling, fingering and feeling with the bilateral upper extremities. AR 336-38.

In December 2008, Plaintiff visited Dr. Keyser, reporting continued symptoms in the upper extremities. AR 361, 430. Dr. Keyser noted that Plaintiff's symptoms improved on Tegretol and he advised her to wear wrist splints. AR 361, 430. In January 2009, Dr. Keyser treated Plaintiff's left wrist with a carpal tunnel steroid injection and prescribed home stretching exercises. AR 360, 429. At her next visit, Plaintiff reported that the steroid injection caused increased pain for three days and did not provide any relief at all. AR 360, 429. She stated that she purposely skipped doses of Tegretol. AR 360, 429. By February, Plaintiff reported a constant pulling pain in her hands as well as numbness. AR 359. After a visit in March 2009, Dr. Keyser stated that he believed the "most bothersome symptoms" were the result of myofascial pain syndrome and not

carpal tunnel syndrome. AR 428.

In March 2009, Joan L. Bradus, M.D., reviewed the evidence in Plaintiff's claim file to date, including records from Dr. Keyser, and noted that fibromyalgia was not established as a diagnosis based on the examinations in the file. AR 406. Dr. Bradus opined that Plaintiff was capable of activities consistent with light work, with limitations in her upper extremities and postural limitations. AR 401-02. She noted that medical improvement was expected. AR 404.

In July 2009, Dr. Keyser summarized his recent treatment, indicating that he felt Plaintiff "possibly" had fibromyalgia, so had started her on Lyrica, which she had tolerated well, but which was not covered by her insurance, so he had switched her to Tegretol, which she also tolerated well. AR 424. He noted that Plaintiff had not been taking the Tegretol "because she does not like to take medication." AR 425. Dr. Keyser explained that he had also prescribed physical therapy, but Plaintiff "had a very spotty attendance record." AR 424. Plaintiff had requested a referral for acupuncture, but later decided not to do it. AR 424-25. He advised her to continue taking her Tegretol and to perform home exercises. AR 426.

In October 2009, Dr. Keyser indicated that nerve conduction studies, conducted by Dr. Economou in September 2009, showed "further improvement" from her August 2008 study and showed "mild to moderate" bilateral carpal tunnel symptoms, left greater than right. AR 421. He noted that Plaintiff had gone to eight sessions of physical therapy for her complaints of pain in her upper arm, shoulders, and neck "which had provided significant relief." AR 421. However, her "symptoms recurred because she was noncompliant with the home exercise program." AR 421. Dr. Keyser gave Plaintiff a list of exercises to perform three times per day and was advised that "her symptoms would not be relieved unless she continued to perform these exercises on a regular basis." AR 421. He noted that Plaintiff was non-compliant with taking the prescribed Tegretol pain medication, so he switched her to Elavil. AR 421.

Plaintiff's next appointment with Dr. Keyser was scheduled for four weeks later, in November 2009, but she "no-showed" and did not contact Dr. Keyser until approximately six months later, in May 2010. AR 419. At that time, Dr. Keyser again noted that physical therapy

3

had provided "significant relief" of Plaintiff's pain symptoms, but that her symptoms recurred because she was noncompliant with the home exercise program. AR 419. He felt that a diagnosis of fibromyalgia "needs to be considered." AR 420. Dr. Keyser indicated that Plaintiff claimed she had been doing the exercises he had given her twice a day, but he found this to be "somewhat doubtful" given Plaintiff's past history of non-compliance with taking her prescribed pain medication. AR 419. He further noted that Plaintiff was not currently taking her prescribed pain medication, Elavil, and took only Motrin on an as needed basis. AR 419. Plaintiff told Dr. Keyser that she did "fast walking one hour per day for exercise, but denied feeling exhausted following this exercise." AR 419. Dr. Keyser indicated that nerve conduction studies demonstrated continued improvement after August 2008 and showed only "mild to moderate" symptoms, left greater than right. AR 419. Plaintiff visited Dr. Keyser again in June 2010, at which time she complained of fibromyalgia and moderately severe to severe pain in all 18 trigger points. AR 418.

In August 2010, Plaintiff told Dr. Keyser that she walked for an hour each day. AR 468. She stated that she was not wearing her splint as prescribed. AR 468. Dr. Keyser indicated that he was following her for "possible fibromyalgia versus regional fibromyositis, right first CMC arthritis, and bilateral elbow medial epicondylitisi/cubital tunnel syndrome." AR 468.

On November 15, 2010, Dr. Keyser submitted a statement on Plaintiff's behalf. AR 414-15. He stated that the objective testing, including the most recent October 2010 nerve conduction studies, revealed that Plaintiff's residual bilateral carpal tunnel syndrome had remained stable since at least 2008. AR 414. He concluded that he could "not account for her symptoms" which "led [him] to believe" that Plaintiff had "generalized fibromyalgia." AR 414. He opined that Plaintiff had "moderate to moderately severe pain in her neck, shoulders, upper and lower extremities, post-exertional fatigue and insomnia which is exacerbated by even light to moderate [activities of daily living]." AR 415. He concluded that because of Plaintiff's symptoms, "she has been unable to pursue gainful employment and should be considered . . . permanently disabled with regards to her employment status." AR 415.

A January 24, 2012, nerve conduction study performed by Dr. Economou continued to

4

1  show moderate bilateral carpal tunnel syndrome affecting sensory and motor components, without
2  evidence of ongoing denervation; and without evidence of cervical radiculopathy or brachial
3  plexopathy. AR 461. Dr. Economou indicated no significant change since the 2010 study. AR
4  461.

5  In an undated statement referencing the 2012 study, Dr. Keyser indicated that he "[felt] she
6  may have fibromyalgia syndrome" and recommended at least an initial evaluation and treatment
7  by a rheumatologist. AR 458.

## SOCIAL SECURITY ADMINISTRATION PROCEEDINGS

On September 26, 2008, Plaintiff filed a claim for Disability Insurance Benefits, alleging disability beginning on August 1, 2008. AR 247. On December 9, 2008, the Social Security Administration ("SSA") denied Plaintiff's claim, finding that she did not qualify for disability benefits. AR 88. Plaintiff subsequently filed a request for reconsideration, which was denied on March 16, 2009. AR 89. On May 8, 2009, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). AR 121-23. ALJ Robert P. Wenten conducted a hearing on July 30, 2010. AR 61-87. Plaintiff testified in person at the hearing and was represented by counsel, Tony Arjo. The ALJ also heard testimony from Vocational Expert Mary Ciddio. AR 79-84.

On September 17, 2010, the ALJ issued a hearing decision, finding that Plaintiff was not disabled under the Act. AR 90-104. Plaintiff requested review of this decision, and the Appeals Council granted review on April 23, 2012, based on new evidence provided by Plaintiff. AR 105-09. It ordered the ALJ to hold another hearing and issue a new hearing decision. AR 107. On October 1, 2012 Plaintiff, accompanied by her attorney, appeared and testified at her second hearing. AR 30-60. The ALJ also took testimony from Vocational Expert Jose Chaparro. The ALJ issued a second decision on December 21, 2012, again finding that Plaintiff was not disabled. AR 14-29. This became the final decision of the Commissioner when the Appeals Council denied review on February 26, 2014. AR 2-5.

Having exhausted all administrative remedies, Plaintiff commenced this action for judicial review pursuant to 42 U.S.C. § 405(g). On October 15, 2014, Plaintiff filed the present Motion for

Summary Judgment. Dkt. No. 12. On November 10, 2014, the Commissioner filed a Cross-Motion for Summary Judgment. Dkt. No. 15.

**A.    July 30, 2010 Hearing**

1.    Plaintiff's Testimony

At the July 2010 hearing, Plaintiff testified that she had been attending English and tailoring classes as the College of Alameda, but she was unable to complete a degree because of problems with her hands, including cutting with scissors. AR 67-68. She stopped attending classes in 2008 and had not worked since. AR 68.

Plaintiff stated that after the two surgeries, "the problem was solved almost," but her hands started aching again, at which point she started physical therapy. AR 71. She stopped physical therapy in 2009, but continued seeing Dr. Keyser once a month as of the date of the hearing. AR 72.

Plaintiff wore a brace on her right hand during the hearing, and she testified that she wore it all day, except while sleeping, to help with the pain. AR 73. She did not wear one on her left hand because it did not hurt as much. AR 74. She testified that she could drive small distances, dress herself, use a knife and fork to eat, and walk for no more than 40 minutes. AR 74, 78. She was unable to use a computer because her hands were numb all the time, and she could not prepare meals, clean the house, or go shopping. AR 74-75.

2.    Vocational Expert's Testimony

The vocational expert testified that Plaintiff had past work experience as a janitor and dental assistant. AR 79-80. The ALJ presented the vocational expert with the following hypothetical:

> If I were to find this woman capable of occasionally lifting and carrying 20 pounds, frequently 10 pounds, standing and walking 6 hours of the work day, and sitting 6 hours of the work day, with limitations in her upper extremities. And those limitations would impair so that she could only do occasional reaching, handling, fingering, and feeling. She could do this . . . frequent, but not constant.

AR 81-82. The vocational expert responded that these limitations would preclude work as a

6

janitor, but would permit work as a dental assistant.  AR 82.  The expert testified that this person could also work as a housekeeper, a car jockey, usher, and a traffic control signaler/flagger.  AR 82-83.

**B.     October 1, 2012 Hearing**

      1.     Plaintiff's Testimony

At the October 1 hearing, Plaintiff testified that she had not worked since the time of the last hearing and that the pain in her hands had gotten worse.  AR 35, 40.  Plaintiff again stated that she could drive and use a knife and fork to eat, and she also stated that she could work the buttons on her clothes, get dressed, take a shower, and brush her hair, although her daughter sometimes helped her.  AR 39.

      2.     Vocational Expert's Testimony

The ALJ presented the vocational expert with the following hypothetical:

> [I]f a person was capable of the standing and sitting that would be typical of light work or even heavy to light work.  In other words, capable of standing a total of six hours or sitting a total of six hours during the course of a work day, but a person who is capable of lifting and carrying small amounts frequently just a few pounds and up to 10 pounds occasionally, . . . and the person can . . . stoop and crouch . . . frequently.  Would the person be capable of . . . being either the kind of janitor this woman was or a chair-side dental assistant?

AR 52.  The expert responded yes for the dental assistant, but no for the janitor.  AR 52.  The ALJ then added that the person could finger and handle only occasionally, which the expert testified would remove the dental assistant job as an option.  AR 52.

The ALJ then presented a second hypothetical:

> Okay, . . . with that profile however, of light work in terms of standing and sitting, but lifting and carrying really at only sedentary limits with frequent capacity to stoop and crouch, and . . . only occasionally . . . reaching, and handling, and fingering, is there – if we have a person who has otherwise, has an extensive education and training as a dental assistant, but it's remote in terms of time.  This person is capable of understanding, and speaking, and writing, very simple English.  Is there other work that a person like that could be expected to do?

AR 53.  The expert testified there would be no work for this person.  AR 54.

7

**C.     The ALJ's Findings**

The regulations promulgated by the Commissioner of Social Security provide for a five-step sequential analysis to determine whether a Social Security claimant is disabled.[1] 20 C.F.R. § 404.1520. The sequential inquiry is terminated when "a question is answered affirmatively or negatively in such a way that a decision can be made that a claimant is or is not disabled." *Pitzer v. Sullivan*, 908 F.2d 502, 504 (9th Cir. 1990). During the first four steps of this sequential inquiry, the claimant bears the burden of proof to demonstrate disability. *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 689 (9th Cir. 2009). At step five, the burden shifts to the Commissioner "to show that the claimant can do other kinds of work." *Id.* (quoting *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988)).

The ALJ must first determine whether the claimant is performing "substantial gainful activity," which would mandate that the claimant be found not disabled regardless of medical condition, age, education, and work experience. 20 C.F.R. § 404.1520(a)(4)(i), (b). Here, the ALJ determined that Plaintiff had not performed substantial gainful activity since September 26, 2008, the disability application date. AR 19, 95.

At step two, the ALJ must determine, based on medical findings, whether the claimant has a "severe" impairment or combination of impairments as defined by the Social Security Act ("Act"). 20 C.F.R. § 404.1520(a)(4)(ii). If no severe impairment is found, the claimant is not disabled. 20 C.F.R. § 404.1520(c). Here, the ALJ determined that Plaintiff had the following severe impairments: "bilateral carpal tunnel syndrome, status post surgery." AR 19, 95.

If the ALJ determines that the claimant has a severe impairment, the process proceeds to the third step, where the ALJ must determine whether the claimant has an impairment or combination of impairments that meet or equals an impairment listed in 20 C.F.R. Part 404, Subpt. P, App. 1. 20 C.F.R. § 404.1520(a)(4)(iii). If a claimant's impairment either meets the listed

---

[1] Disability is "the inability to engage in any substantial gainful activity" because of a medical impairment which can result in death or "which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d) (1)(A).

8

criteria for the diagnosis or is medically equivalent to the criteria of the diagnosis, he is conclusively presumed to be disabled, without considering age, education and work experience. 20 C.F.R. § 404.1520(d).  Here, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that meets the listings.  AR 19, 95.

Before proceeding to step four, the ALJ must determine the claimant's Residual Function Capacity ("RFC").  20 C.F.R. § 404.1520(e).  RFC refers to what an individual can do in a work setting, despite mental or physical limitations caused by impairments or related symptoms.  20 C.F.R. § 404.1545(a)(1).  In assessing an individual's RFC, the ALJ must consider all of the claimant's medically determinable impairments, including the medically determinable impairments that are nonsevere.  20 C.F.R. § 404.1545(e).  In the September 17, 2010 decision, the ALJ determined that Plaintiff "has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except she must perform no more than frequent pushing and pulling with her right upper extremity."  AR 95-96.  In the December 21, 2012 decision, the ALJ determined that Plaintiff has the RFC to "perform light work as defined in 20 CFR 416.967(b), except she must perform no more than frequent reaching, feeling and handling, and occasional fingering, with her right upper extremity."  AR 20

The fourth step of the evaluation process requires that the ALJ determine whether the claimant's RFC is sufficient to perform past relevant work.  20 C.F.R. §§ 404.1520(a)(4)(iv); 404.1520(f).  Past relevant work is work performed within the past 15 years that was substantial gainful activity, and that lasted long enough for the claimant to learn to do it.  20 C.F.R. § 404.1560(b)(1).  If the claimant has the RFC to do his past relevant work, the claimant is not disabled.  20 C.F.R. § 404.1520(a)(4) (iv).  Here, the ALJ initially determined that Plaintiff could perform past relevant work as a dental assistant.  AR 98.  However, in the December 21 decision, the ALJ determined that Plaintiff has no past relevant work.  AR 22.

In the fifth step of the analysis, the burden shifts to the Commissioner to prove that there are other jobs existing in significant numbers in the national economy which the claimant can perform consistent with the claimant's RFC, age, education, and work experience.  20 C.F.R. §§

404.1520(g); 404.1560(c). The Commissioner can meet this burden by relying on the testimony of a vocational expert or by reference to the Medical-Vocational Guidelines at 20 C.F.R. pt. 404, Subpt. P, App. 2. *Lounsburry v. Barnhart*, 468 F.3d 1111, 1114 (9th Cir. 2006). Here, based on the testimony of the vocational expert, Plaintiff's age, education, work experience, and RFC, the ALJ determined that significant numbers of jobs exist in the national economy that Plaintiff can perform. AR 23. Specifically, the ALJ determined that Plaintiff could work as a housekeeper, traffic control signaler, and usher. AR 24. As such, the ALJ concluded that Plaintiff has not been under a disability as defined by the Act. AR 24.

## LEGAL STANDARD

This Court has jurisdiction to review final decisions of the Commissioner pursuant to 42 U.S.C. § 405(g). The ALJ's decision must be affirmed if the findings are "supported by substantial evidence and if the [ALJ] applied the correct legal standards." *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (citation omitted). "Substantial evidence means more than a scintilla but less than a preponderance" of evidence that "a reasonable person might accept as adequate to support a conclusion." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002) (quoting *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995)). The court must consider the administrative record as a whole, weighing the evidence that both supports and detracts from the ALJ's conclusion. *McAllister v. Sullivan*, 888 F.2d 599, 602 (9th Cir. 1989). However, "where the evidence is susceptible to more than one rational interpretation," the court must uphold the ALJ's decision. *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989). Determinations of credibility, resolution of conflicts in medical testimony, and all other ambiguities are to be resolved by the ALJ. *Id.*

Additionally, the harmless error rule applies where substantial evidence otherwise supports the ALJ's decision. *Curry v. Sullivan*, 925 F.2d 1127, 1131 (9th Cir. 1990). A court may not reverse an ALJ's decision on account of an error that is harmless. *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (citing *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055-56 (9th Cir. 2006)). "'[T]he burden of showing that an error is harmful normally falls upon the party

attacking the agency's determination.'" *Id.* (quoting *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009).

## DISCUSSION

Plaintiff raises two issues: (1) the ALJ's analysis of Plaintiff's fibromyalgia; and (2) rejection of Dr. Keyser's medical opinion. The Court shall consider them separately.

**A.  Fibromyalgia**

Plaintiff's first argument is that the ALJ erred in not finding fibromyalgia as a severe impairment. Pl.'s Mot. at 5-6. Plaintiff argues that Dr. Keyser diagnosed fibromyalgia, and the ALJ was therefore required to consider this impairment under Social Security Ruling ("SSR") 12-2p. Pl.'s Mot. at 6. In response, Defendant contends that Plaintiff did not allege disability due to fibromyalgia at the administrative level. Def.'s Mot. at 2. Defendant notes that the ALJ did discuss Dr. Keyser's diagnosis of possible fibromyalgia, but no further analysis was warranted under relevant Agency written guidance. *Id.*

SSR 12-2p applies when "a person seeks disability benefits due in whole or in part to FM." 2012 WL 3104869, at *2. Ruling 12-2p explains that, based on the American College of Rheumatology Criteria for the Classification of Fibromyalgia, a diagnosis of fibromyalgia must be based on all three of the following: (1) a history of widespread pain in all quadrants of the body that persisted for at least 3 months; (2) at least 11 out of 18 positive tender points on physical examination with digital palpation of an approximate force of 9 pounds; and (3) evidence that other disorders that could cause the symptoms or signs were excluded. 2012 WL 3104869 at *3.

Here, as a preliminary matter, the Court notes that Plaintiff did not allege disability due to fibromyalgia at the administrative level. Plaintiff alleged that she was disabled since August 2008 due to bilateral hand and arm pain and surgery in the wrists and hands. AR 19, 272, 285, 297. At the administrative hearings, accompanied by her attorney, she did not allege that she was disabled due to fibromyalgia or even to pain in all quadrants of her body. Despite this, the ALJ did discuss Dr. Keyser's diagnosis of possible fibromyalgia, but found that no further analysis was warranted. AR 21-22. The ALJ noted that Plaintiff's "continuing pain complaints, absent significant

11

objective findings, have led her treating physician to conclude that a fibromyalgia diagnosis may be worth exploring, suggesting the claimant seek evaluation and possible treatment with a rheumatologist." AR 21. However, as of the date of the ALJ's decision, he noted that Plaintiff had not done so. AR 21. Notably, other than pointing out that the ALJ does not discuss fibromyalgia in more detail, Plaintiff does not point to any evidence indicating that she had disabling limitations due to the disorder. It is the claimant's burden to prove disability. 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Secretary may require"); *Clem v. Sullivan*, 894 F.2d 328, 330 (9th Cir. 1990) ("Clem has the burden of showing that he is disabled"). The ALJ "cannot be responsible for diagnosing a problem that a claimant decides not to pursue." *Mayes v. Massanari*, 276 F.3d 453, 463 (9th Cir. 2001).

It is undisputed that Dr. Keyser noted several times during the course of treatment that Plaintiff could have fibromyalgia. AR 432 (noting "probable fibromyalgia"); AR 362, 431 (follow up for "possible fibromyalgia"); AR 424 (summarizing recent treatment, indicating that he felt Plaintiff "possibly" had fibromyalgia); AR 468 (indicating that he was following her for "possible fibromyalgia"); AR 414 (concluding that he could "not account for her symptoms" which "led [him] to believe" that Plaintiff had "generalized fibromyalgia"). He noted 18 trigger point with moderately severe to severe pain. AR 418. However, apart from Dr. Keyser's diagnosis of possible fibromyalgia, it does not appear that he, or any other physician, ever formally diagnosed fibromyalgia. While he felt that a diagnosis of fibromyalgia "needs to be considered," he also noted that physical therapy provided "significant relief" of Plaintiff's pain symptoms, but her symptoms recurred because she was noncompliant with the home exercise program. AR 419-20. He also stated that objective testing revealed that Plaintiff had remained stable and concluded that he could "not account for her symptoms." AR 414.

Further, Dr. Keyser was Plaintiff's hand surgeon, and he recommended an initial evaluation and treatment by a rheumatologist for possible fibromyalgia. AR 458. However, as the ALJ noted, there is no indication in the record that Plaintiff followed up on this referral. AR 22.

12

Indeed, the record indicates that Plaintiff never visited a specialist, such as a rheumatologist, for a formal diagnosis of fibromyalgia. AR 22. Even if the Court were to consider Dr. Keyser's diagnosis, the record in this case does not show any of these three required elements under SSR 12-2p. First, Plaintiff reported a history of upper quadrant pain, not "a history of widespread pain in all quadrants of the body." Second, even if Dr. Keyser's notes indicate that all 18 tender points were positive,[2] there is no evidence that Dr. Keyser performed the testing as it is described under SSR 12-2p ("with digital palpation of an approximate force of 9 pounds"). Third, except for Plaintiff's carpal tunnel disorder, there is no "evidence that other disorders that could cause the symptoms or signs were excluded."

Finally, the Court notes that Plaintiff does not dispute the ALJ's credibility finding. The ALJ explained that Plaintiff's treatment notes with Dr. Keyser indicated that she had not been consistent in taking her pain medications, which belied her allegations of constant, debilitating hand pain. AR 21. In October 2009 and May 2010, Dr. Keyser noted that he had been treating Plaintiff for complaints of pain in her upper arm, shoulders, and neck and she had gone to eight sessions of physical therapy "which had provided significant relief." AR 419, 421. "However, her symptoms recurred because she was noncompliant with the home exercise program." AR 419, 421. In October 2009, Plaintiff was given a list of exercises to perform three times per day and was advised that "her symptoms would not be relieved unless she continued to perform these exercises on a regular basis." AR 419, 421. Her next appointment with Dr. Keyser was scheduled for four weeks later, in November 2009, but she "no-showed" and did not contact Dr. Keyser until approximately six months later, in May 2010. AR 419. During the May 2010 visit, Dr. Keyser noted that Plaintiff claimed she had been doing the exercises twice a day, but he found this to be "somewhat doubtful" given Plaintiff's past history of non-compliance with taking her prescribed pain medication. AR 419. He further noted that Plaintiff was not currently taking her prescribed

---

[2] Defendant maintains that Dr. Keyser's notation regarding 18 trigger points (AR 418) is listed under the heading "subjective complaints," and is not necessarily a finding on examination. Def.'s Mot. at 3, 4.

pain medication and took only Motrin on an as needed basis. AR 419. Plaintiff's own failure to follow her prescribed pain treatment or seek additional treatment, including her failure to pursue the possibility of fibromyalgia, indicated that her pain was not disabling, as she alleged. See *Fair v. Bowe*n, 885 F. 2d 597, 603 (9th Cir. 1989) (holding unexplained, or inadequately explained, failure to follow a prescribed course of treatment may be sufficient to discredit allegation of disabling pain); 20 C.F.R. § 416.930(b) ("If you do not follow the prescribed treatment without a good reason, we will not find you disabled.").

Thus, based on the record before it, the Court finds no error in the ALJ's analysis of Plaintiff's fibromyalgia.

**B.    Dr. Keyser**

In his opinioin, the ALJ gave little weight to the opinion of Dr. Keyser, Plaintiff's treating physician. AR 22. Plaintiff argues that the ALJ committed legal error because he "overlooks Dr. Keyser's diagnosis and the objective findings of fibromyalgia." Pl.'s Mot. at 6. In response, Defendant maintains that the ALJ gave good reasons, supported by substantial evidence, for giving little weight to Dr. Keyser's opinion, and that if subject to another rational interpretation, the ALJ's rational interpretation of the evidence was supported by substantial evidence, so should be upheld. Def.'s Mot. at 8.

Generally, an opinion of a treating physician should be favored over that of a non-treating physician. *Lester v. Chater*, 81 F.3d 821, 830-31 (9th Cir. 1995). However, a treating physician's opinion "is not binding on an ALJ with respect to the existence of an impairment or the ultimate determination of disability." *Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001). If a treating physician's opinion is uncontradicted, an ALJ must give "clear and convincing" reasons that are supported by substantial evidence to reject the opinion. *Lester*, 81 F.3d at 830-31. On the other hand, if the treating physician's opinion is contradicted, an ALJ needs to only give "specific and legitimate reasons [that are] supported by substantial evidence in the record" to reject the opinion. *Id.* Further, the opinions of a specialist about medical issues related to his or her area of specialization are given more weight than the opinions of a nonspecialist. 20 C.F.R. §

14

404.1527(c)(5); 20 C.F.R § 416.927(c)(5). "The ALJ is responsible for determining credibility and resolving conflicts" or ambiguities in the medical evidence. *Magallanes*, 881 F.2d at 750.

In determining what weight to give a medical opinion, the ALJ should give a treating physician's opinion controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007); 20 C.F.R. § 404.1527(d)(2). As explained in Social Security Ruling 96–2p:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. [§] 404.1527. . . . In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

S.S.R. 96–2p at 4 (Cum. Ed. 1996), available at 61 FR 34490-01 (July 2, 1996). Accordingly, when an ALJ finds a treating physician's opinion is not entitled to controlling weight, the following factors should be used to determine what weight to give that opinion: length of the treatment relationship and the frequency of examination, nature and extent of the treatment relationship, supportability, consistency, specialization, and any factors that may have bearing. 20 C.F.R. § 404.1527(c)(2)-(6); *see also Orn*, 495 F.3d at 632.

In his November 30, 2008 medical source statement, Dr. Keyser opined that Plaintiff was unable to lift and/or carry more than 10 pounds occasionally; could perform no more than occasional stooping, kneeling, crouching; and no more than occasional reaching, handling, fingering and feeling with the bilateral upper extremities. AR 336-38. Subsequently, in a November 15, 2010 summary statement, Dr. Keyser summarized Plaintiff's treatment history, eventually concluding that because of her continued pain symptoms, "she has been unable to pursue gainful employment and should be considered . . . permanently disabled with regards to her employment status." AR 414-15.

The ALJ found Dr. Keyser's opinion "somewhat puzzling and disingenuous, primarily because it is not support by his treatment notes of the claimant. Dr. Keyser himself noted there is a lack of objective findings to substantiate the claimant's pain complaints, so much so that he suggested the claimant consult a rheumatologist and explore the possibility of fibromyalgia as a diagnosis." AR 22, 458. The ALJ also reiterated that Plaintiff had not established fibromyalgia as a medically determinable impairment, so it was "entirely unclear what medically determinable impairment is responsible for the lower extremity limitations in the reports of Dr. Keyser." AR 22. For example, in May 2009, after a half-a-year treatment gap, Dr. Keyser noted that Plaintiff did "fast walking one hour per day for exercise, but denies feeling exhausted following this exercise." AR 419. While he felt that a diagnosis of fibromyalgia "needs to be considered," he also noted that physical therapy provided "significant relief" of Plaintiff's pain symptoms, but her symptoms recurred because she was noncompliant with the home exercise program. AR 419-20. Dr. Keyser also stated that objective testing revealed that Plaintiff had remained stable and concluded that he could "not account for her symptoms." AR 414. In line with this, the ALJ noted that the objective findings were similarly inconsistent with Dr. Keyser's opinion. The ALJ noted that numerous NCS/EMG nerve conduction studies showed significant improvement. AR 22. Indeed, in October 2009 and May 2010, Dr. Keyser indicated that nerve conduction studies demonstrated continued improvement after August 2008 and showed only "mild to moderate" symptoms, left greater than right. AR 419, 421.

Thus, based on the record before it, the Court finds that the ALJ gave good reasons, supported by substantial evidence, for giving little weight to Dr. Keyser's opinion. Further, even if his opinion were subject to another rational interpretation, the Court must uphold the ALJ's decision. *Magallanes*, 881 F.2d at 750.

## CONCLUSION

For the reasons stated above, the Court finds that the ALJ's decision in this case is supported by substantial evidence and is free of legal error. Accordingly, the Court DENIES Plaintiff's Motion for Summary Judgment and GRANTS Defendant's Cross-Motion for Summary

Judgment.

**IT IS SO ORDERED.**

Dated: January 21, 2015

_____
MARIA-ELENA JAMES
United States Magistrate Judge

17